Tarver, Appellant, *v.* Pierpoint M. Co. et al.

190

Argued May 5, 1932.

Before TREXLER, P. J., KELLER, GAWTHROP, CUNNINGHAM, BALDRIGE, STADTFELD and PARKER, JJ.

*Edward Friedman,* and with him *Charles J. Margiotti* and *Andrew S. Romito,* for appellant.

*Charles F. Patterson* of *Patterson, Sherrard & Miller,* for appellee.

Opinion by Cunningham, J., July 14, 1932:

William H. Tarver, husband of claimant and an employe at the McKeesport garage of Pierpoint Motor Company, was fatally shot by Frank Kerekes, a police officer on duty and in uniform, during a scuffle which occurred in the garage when he followed, and attempted to arrest Tarver for certain violations of our Motor Vehicle Code, committed in his view; both participants were wounded by bullets from the officer's revolver.

His widow, in behalf of herself and two minor children, claimed compensation from the motor company as her husband's employer. The company and its insurance carrier denied liability on two grounds: (1) that Tarver by his violations of a penal statute—operating a motor vehicle without license plates and at an unlawful rate of speed—had taken himself out of "the course of his employment," and (2) that his injuries were caused "by an act of a third person intended to injure [him] because of reasons personal to him, and not directed against him as an employe or because of his employment."

The referee and board awarded compensation in the amount of $7,503.93, but the court below sustained the defendants' exceptions, reversed the award and entered judgment in favor of the employer upon the ground that Tarver, by his violations of law, had taken himself out of the course of his employment. The claimant now appeals to this court from that judgment.

Upon reviewing the record, we find ourselves unable to perform properly one of the duties committed to us, because the compensation authorities, the triers of the facts, have not made any findings upon certain issues of fact, which, in our opinion, must be decided one way

or the other before we can determine whether the law has been properly applied to the controlling facts of this case.

A reference to some of the facts found by the referee and board, as well as to matters upon which no findings were made, will illustrate our difficulty in dealing with the primary problem here involved; viz., whether the employe had taken himself out of the course of his employment. The scope of that inquiry is broader than the compensation authorities seem to have realized. It is true the injuries were received on the employer's premises, but we agree with the court below that their infliction was the culmination of an unbroken sequence of events which began with the illegal driving by Tarver of an automobile past the officer at a street intersection located some distance from the garage. It is, therefore, highly important for the courts to know, by means of specific findings of fact, why Tarver was driving one of his employer's cars in that manner and at that point, i. e., whether he was then "actually engaged in the furtherance of the business or affairs of [his] employer," or whether he was upon a mission of his own, unconnected with the business of his employer and not within the risks which its insurance carrier assumed. His violation of the statute seems to be conceded all around, but it is essential to know whether it was by the direction or with the knowledge and permission of his employer. This record is silent upon these material inquiries. This may be due, in part at least, to the fact that when this case came on for hearing before the referee counsel for the parties, instead of developing the facts in the usual way by the introduction of testimony, stipulated that the testimony of certain witnesses, taken when the officer was tried and acquitted in the criminal courts upon the charge of being criminally responsible for Tarver's death, should be con-

sidered as testimony adduced before the referee. The issue in the criminal case was so different from those upon which the compensation case must be determined that many matters, immaterial in that case but of controlling importance here, have been overlooked. For instance, the officer attempted to arrest Tarver without a warrant and counsel for claimant have argued at length in their brief that, as the violations of the code, with which he was charged, were neither misdemeanors nor felonies but punishable only by summary convictions before a magistrate, the attempted arrest was illegal and Tarver was, therefore, justified in resisting; that may have been material at the criminal trial but we are unable to see its materiality in this case.

The character of Tarver's employment and a description of the occurrences in the garage on the evening of August 31, 1929, appear from the following excerpt from the testimony of James F. Gregg, a salesman for the employer: "Q. What were his [Tarver's] duties there? A. He was just a man, all around man, car washer, bringing the cars in off the street, moving them around, changing batteries, doing odds and ends. Q. How long had he been working for the Pierpoint Motor Company? A. He was working there quite a long while before I came there. I don't know how long, myself. He was there before I came. Q. Were you present the night he was killed? A. Yes. Q. Now, just tell us when you first saw him and all that happened there? A. I came back in the garage, in the used car department, between seven-thirty and eight o'clock. As I walked back in the garage, Tarver came down the ramp [one of the entrances into the garage] in an Essex coupe. As he came down, I went up and spoke to him to be sure to get all the used cars off the street. That was Mr. Daerr's orders, that no used cars should be left on the street that evening. As

I came over there, Officer Kerekes came over and spoke to him and said, 'what do you mean by racing up the street at 50 miles an hour without any license plates?' And he went over to the Willys-Knight car, and he said, 'And here's the car. It's still warm,' and he goes over to him and says 'I am going to put you under arrest.' Bill [Tarver] said, 'You can't put me under arrest for that.' I said, 'Don't do that.' I thought we could settle it. I said, 'I'll get the bookkeeper, he'll put up bail, and not take him off the job,' and he says, 'Come on, get out of that car. Come on. I am taking you down.' Bill was out of the car then. They walked over and as he walked over, Kerekes grabbed him by the arm. The officer struck him a blow on the head with his mace. Well, they argued there for a few minutes, and then he raised his hand again to hit him another blow with the mace, and Tarver grabbed his arm like that (indicating), and they slip or fall in between the car. As they went down in between the car, the officer was down between the bumper and the headlights, and Tarver was laying on top of him like that. Then he started to shoot, and I hollered, 'Don't shoot.' I hollered, 'Don't shoot,' and he started to shoot. Q. Who started to shoot? A. The officer.''

Daerr, the local manager for the motor company, testified: ''Q. Where did you keep your used cars? A. We had a lot across the street where we kept our old junkers, junkers, no good cars. We kept our good cars in the back of the building where the trouble was. Q. Did you have any good cars out on the lot during that day? A. No, standing on the street. Q. To take the cars from the lot or the street, how would you drive? A. Down Walnut Street to Eleventh and right down the alley to the ramp. Q. Then right down the ramp? A. Yes. Q. Was that part of Tarver's duties? A. Yes. Q. You weren't there the night of the killing? A. No, sir.''

Officer Kerekes, after stating he had known Tarver for several years as a colored employe at the garage, testified that he first saw him, after coming on duty on the afternoon of August 31st, on Walnut Street between Tenth and Whigham, some time between four and five o'clock. His testimony continued: "Q. What was he doing then? A. He was standing in line. Traffic was blocked up past from Shaw Avenue and Walnut Street from the B. & O. crossing, past Tenth Avenue. Q. Was he in an automobile? A. Yes, he was in a machine. Q. Did you say anything to him then? A. I noticed he didn't have no license plates on the car. I walked right out to him and I asked him, I said, 'William, you want to get out of this bad habit of driving around town without any license plates on cars. You better put this car back in the garage.' He says, 'Frank, I got a call down Shaw Avenue. Will you give me that much privilege to drive down there and I'll put the car back in the garage.' I said, 'About my part, I give you that much privilege, but be careful. You better put that car back in the garage. If you don't, and I run into you a second time, you know where you go.' He said, 'All right, I'll put the car back.' ...... Q. When next did you see him? A. The next time I seen him coming up out of Rose Street, to 11th Avenue. I was standing on the corner of 11th and Market Street. Q. About what time was that? A. Why, I noticed the time when I was standing on the corner. Somebody hollered, 'Look at that colored fellow that works over in the Essex garage, what condition he's driving the car,' and I pulled my watch and it was exactly quarter to eight, savings' time. ...... Q. You looked at your watch? A. Yes. Q. What time did you pull your box? A. I stood there five more minutes. My regular time was to make my ring ten minutes to the hour. I made my ring ten minutes to the hour, and I walked on up 11th, over to

Tube Works Street, and I went down in the garage. ...... Q. You say he was driving the car. Did you see him? A. Why, he was driving the car up into the intersection street and Market, about 40 or 45 miles an hour. Q. When past Market, what did he come to next? A. He crossed the B. & O. tracks and fence, and across Walnut Street on up to the Tube Works. Q. When he crossed the track and Walnut Street, did he slow up? A. No, he was blowing the horn all the way through. ....... Q. Did you notice anything happening to his car when he hit the B. & O. Railroad tracks? A. The only thing I seen when he hit the B. & O. tracks and crossed, the whole car bounced up more than two feet high. ....... Q. You knew it was Mr. Tarver? A. I seen him, yes. ....... Q. What did you say when you got in there? A. When I went in the garage I looked around to see if I could see the same car Tarver drove up 11th Avenue, and I found the car just a little piece back ...... and I walked up to the car, and I laid my hand on the radiator, and it was still hot, and asked the people, 'where is the colored fellow that put the car in there,' and they told me he went up the street, and I walked back out of the garage out on the street. Q. Did you see him when you got out on the street? A. Not right away. I walked up 11th Avenue and he was driving another car [the Essex coupe] down into the garage and I followed him back in the garage. ...... Q. When you got down there, did you see Tarver the second time? A. The second time when I went back down there, he was out of the car, and I walked up to him." The officer then gave his version of the shooting.

This testimony seems to indicate that Tarver was covering considerably more territory than that indicated by Daerr as the route by which cars were removed from the lot across the street into the garage; at least specific findings are necessary as to the reason

for Tarver's presence in the vicinity of the B. & O. Railroad crossing.

Moreover, there was other testimony throwing some light upon the inquiry whether Tarver, while absent from the garage, was engaged on his own affairs or furthering the "business or affairs" of his employer.

Leo Grygo testified he was acquainted with Tarver from having met him at various times in a speakeasy on Rose Street near 11th and that he met him about twenty minutes before seven that evening at a ball field. A portion of his testimony reads: "Q. What was he doing down there? A. Just loafing around. I was supposed to umpire a baseball game, and he called me over and asked me if I'd like to have a drink, and I said, I wouldn't mind a drink or two. I said, 'Have you got any with you?' And he said, 'No, let's go down —' Q. Did you go down? A. Yes, we went down and we had two small drinks of moonshine. Q. How did you go up there? A. Walked up. Q. Did he have an automobile down at the ball park? A. Not down at the ball park. Q. What went on at this place? A. Tarver drank two with me and took a pint. He said, 'I got a machine out there. Come on get in it, I'll take you down the field.' I said, 'No, you are wobbly anyhow. Don't drink that liquor or you will get goofey.' He said, 'I won't drink a pint. I am taking it up for a friend of mine.' Q. What was his condition when you left him? A. When I left him he had no business behind the steering wheel of an automobile. Q. He was drunk? A. Yes, he was drunk. Q. You left him, did you? A. Yes. Q. Went back to the ball park? A. Yes. Q. When did you next see this man Tarver? A. Well, I saw him then about five or ten minutes after seven, something around seven o'clock, coming out of Brick Alley when I was standing at the corner of 11th and Market. He came out the first street there by the river, that's where the

street ends, he came out of there over onto the curbstone, on the left hand side near Market and turned by a telegraph pole and he came so close to the telegraph pole I was sure it took the left side of the machine. I was sure he damaged it, but after I goes down, where I thought he hit the pole, I couldn't tell whether it did or not. Q. Was that 11th Street? A. That was coming into 11th, off Brick. Q. Coming up 11th Street, where did he go? A. Started up 11th, kept on going, didn't stop at Market, didn't stop at French. He hit the railroad track and the whole car jumped up about two or three feet in the air. He kept on going and didn't stop at Walnut, and turned to the left at Tube Works Alley. Then I saw Kerekes when I went up there—.''

The salesman, Gregg, to whom we have already referred, testified that Tarver was not ''drunk or staggering'' when he reached the garage but ''he had drink on his breath;'' the evidence we have just quoted seems to have been entirely ignored by the compensation authorities.

Counsel for claimant say in their brief that while it is clear Tarver was violating the code, it is equally clear that he was carrying out the ''directions'' of his employer and ''performing an illegal act at the direction and with the consent of the defendant company.'' This statement is vigorously denied by counsel for the employer. The record contains neither evidence, nor a, finding one way or the other, on this crucial question.

If Tarver was driving the Willys-Knight car, identified by the officer in the garage, upon a mission of his own—visiting speakeasies, ball fields, etc.,—without the knowledge or consent of his employer, it would not be difficult to conclude that he, by his violations of the statute, took himself out of the course of his employment and deprived his dependents of any right

to compensation: Walcofski v. Lehigh Valley Coal Company, 278 Pa. 84; Shoffler v. Lehigh Valley Coal Company, 290 Pa. 480; Zenker v. Zenker and the Fidelity & Casualty Company of New York, 93 Pa. Superior Ct. 255. See also Zapos v. Demas, 106 Pa. Superior Ct. 183.

But if he was acting under, and in accordance with, the instructions of his employer, or even with its knowledge and approval, then a different conclusion would be possible. It is obvious that the law cannot be applied accurately in this case without specific findings on these matters; such findings will also be helpful if it should become necessary to consider the second branch of the defense.

The board found as a fact that Tarver had not been "sufficiently identified" as the driver of the car. As the case must go back it may be proper to say that we agree with the court below in holding that there was no evidence to support this finding; indeed, it is contrary to all the evidence.

We have endeavored to indicate the pivotal issue in this case, as we view it, and will make an order directing that the record be remitted to the board for specific findings on the matters above mentioned; the employer's appeal from the award of compensation will still be pending in the court below and that court will be enabled, upon the return of the findings, to decide, in the light of all the material facts, such questions of law as may then be involved.

The judgment in favor of the Pierpoint Motor Company is vacated; the record is remitted to the court below with instructions to transmit it to the board for further action not inconsistent with this opinion.